UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

IN THE MATTER OF THE SEARCH OF
INFORMATION THAT IS STORED AT
PREMISES CONTROLLED BY GOOGLE, 1600
AMPHITHEATRE PARKWAY, MOUNTAIN
VIEW, CALIFORNIA 94043

**FILED UNDER SEAL**

Case No. 22-mj-63-01-AJ

## <u>AFFIDAVIT</u>

I, John Forte, having been duly sworn, depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a warrant to search
information that is stored at premises controlled by Google, an electronic communication service
and remote computing service provider headquartered in Mountain View, California.  The
information to be searched is described in the following paragraphs and in Attachment A.  This
affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A), and 2703(c)(1)(A) to require Google to disclose to the government the
information further described in Attachment B.I.  The government will then review that
information and seize the information that is further described in Attachment B.II.

2.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), United States Department of Justice, and have been so employed since 2002.
I am currently assigned to the ATF Boston Field Division, Manchester, New Hampshire Field
Office, and charged with investigating criminal offenses involving the federal firearms,
explosives, arson, alcohol, and tobacco diversion laws.

3.      I have received extensive training in the federal firearms laws and am familiar
with ATF's regulations regarding the purchase and sales of firearms.  I have successfully

completed the Criminal Investigations Training Program and the ATF New Professional

Training (NPT) at the Federal Law Enforcement Training Center in Glynco, GA.  During the

NPT program, I learned how to investigate criminal offenses involving the federal firearms,

explosives, arson, alcohol, and tobacco diversion laws.  I have received advanced training with

regard to conducting complex firearms trafficking investigations.  I have participated in dozens

of investigations relating to the illegal acquisition and sales of firearms, the illegal manufacture

and possession of National Firearms Act weapons and previously have sworn out numerous

affidavits in support of search warrants and arrest warrants in firearms cases.  I have been

certified as an Interstate Nexus Expert, that is, an expert in establishing whether particular

firearms or ammunition have traveled in interstate commerce thereby satisfying the interstate

commerce element of many federal firearms crimes.

4.      The information contained within this affidavit is based upon my training,

experience, and investigation, as well as information that has been conveyed to me by other law

enforcement officers and witnesses.  The following is either known to me personally or has been

related to me by persons having direct knowledge of the events described below, including other

law enforcement officers involved in this investigation.  Since this affidavit is being submitted

for the limited purpose of establishing probable cause, I have not included each and every fact

known to me concerning this investigation.

5.      Based on the facts set forth in this affidavit, there is probable cause to search the

information described in Attachment A for evidence of violations of Title 18, United States

Code, United States Code, Section 922(u), theft of a firearm(s) from a Federal firearms licensee

(hereinafter, "FFL").  Based on the facts set forth in this affidavit, I submit there is probable

cause that violations of 18 U.S.C. §922(u) occurred.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

7.      Based on my training and experience, I know that cellular devices, such as mobile telephones, are wireless devices that enable their users to send or receive wire and/or electronic communications using the networks provided by cellular service providers.  Using cellular networks, users of many cellular devices can send and receive communications over the Internet.

8.      I also know that many devices, including but not limited to cellular devices, have the ability to connect to wireless Internet ("wi-fi") access points if the user enables wi-fi connectivity.  These devices can, in such cases, enable their users to send or receive wire and/or electronic communications via the wi-fi network.  A tablet such as an iPad is an example of a device that may not have cellular service but that could connect to the Internet via wi-fi.  Wi-fi access points, such as those created through the use of a router and offered in places like homes, hotels, airports, and coffee shops, are identified by a service set identifier ("SSID") that functions as the name of the wi-fi network.  In general, devices with wi-fi capability routinely scan their environment to determine what wi-fi access points are within range and will display the names of networks within range under the device's wi-fi settings.

9.      Based on my training and experience, I also know that many devices, including many cellular and mobile devices, feature Bluetooth functionality.  Bluetooth allows for short-range wireless connections between devices, such as between a device such as a cellular phone

or tablet and Bluetooth-enabled headphones. Bluetooth uses radio waves to allow the devices to exchange information. When Bluetooth is enabled, a device routinely scans its environment to identify Bluetooth devices, which emit beacons that can be detected by devices within the Bluetooth device's transmission range, to which it might connect.

10.     Based on my training and experience, I also know that many cellular devices, such as mobile telephones, include global positioning system ("GPS") technology. Using this technology, the device can determine its precise geographical coordinates. If permitted by the user, this information is often used by apps installed on a device as part of the apps' operation.

11.     Based on my training and experience, I know Google is a company that, among other things, offers an operating system ("OS") for mobile devices, including cellular phones, known as Android. Nearly every device using the Android operating system has an associated Google account, and users are prompted to add a Google account when they first turn on a new Android device.

12.     In addition, based on my training and experience, I know that Google offers numerous apps and online-based services, including messaging and calling (e.g., Gmail, Hangouts, Duo, Voice), navigation (Maps), search engine (Google Search), and file creation, storage, and sharing (e.g., Drive, Keep, Photos, and YouTube). Many of these services are accessible only to users who have signed into their Google accounts. An individual can obtain a Google account by registering with Google, and the account identifier typically is in the form of a Gmail address (e.g., example@gmail.com). Other services, such as Maps and YouTube, can be used with limited functionality without the user being signed into a Google account.

13.     Based on my training and experience, I also know Google offers an Internet browser known as Chrome that can be used on both computers and mobile devices. A user has

the ability to sign-in to a Google account while using Chrome, which allows the user's
bookmarks, browsing history, and other settings to be uploaded to Google and then synced
across the various devices on which the subscriber may use the Chrome browsing software,
although Chrome can also be used without signing into a Google account.  Chrome is not limited
to mobile devices running the Android operating system and can also be installed and used on
Apple devices and Windows computers, among others.

14.     Based on my training and experience, I know that, in the context of mobile
devices, Google's cloud-based services can be accessed either via the device's Internet browser
or via apps offered by Google that have been downloaded onto the device.  Google apps exist
for, and can be downloaded to, devices that do not run the Android operating system, such as
Apple devices.

15.     According to my training and experience, as well as open-source materials
published by Google, I know that Google offers accountholders a service called "Location
History," which authorizes Google, when certain prerequisites are satisfied, to collect and retain
records of the locations where Google calculated a device to be based on information transmitted
to Google by the device.  That Location History is stored on Google servers, and it is associated
with the Google account that is associated with the device.  Each accountholder may view their
Location History and may delete all or part of it at any time.

16.     Based on my training and experience, I know that the location information
collected by Google and stored within an account's Location History is derived from sources
including GPS data and information about the wi-fi access points and Bluetooth beacons within
range of the device.  Google uses this information to calculate the device's estimated latitude and
longitude, which varies in its accuracy depending on the source of the data.  Google records the

margin of error for its calculation as to the location of a device as a meter radius, referred to by Google as a "maps display radius," for each latitude and longitude point.

17.    Based on open-source materials published by Google and my training and experience, I know that Location History is not turned on by default.  A Google accountholder must opt-in to Location History and must enable location reporting with respect to each specific device and application on which they use their Google account in order for that usage to be recorded in Location History.  A Google accountholder can also prevent additional Location History records from being created at any time by turning off the Location History setting for their Google account or by disabling location reporting for a particular device or Google application.  When Location History is enabled, however, Google collects and retains location data for each device with Location Services enabled, associates it with the relevant Google account, and then uses this information for various purposes, including to tailor search results based on the user's location, to determine the user's location when Google Maps is used, and to provide location-based advertising.  As noted above, the Google accountholder also has the ability to view and, if desired, delete some or all Location History entries at any time by logging into their Google account or by enabling auto-deletion of their Location History records older than a set number of months.

18.    Location data, such as the location data in the possession of Google in the form of its users' Location Histories, can assist in a criminal investigation in various ways.  As relevant here, I know based on my training and experience that Google has the ability to determine, based on location data collected and retained via the use of Google products as described above, devices that were likely in a particular geographic area during a particular time frame and to determine which Google account(s) those devices are associated with.  Among other things, this

information can indicate that a Google accountholder was near a given location at a time relevant

to the criminal investigation by showing that his/her device reported being there.

19.     Based on my training and experience, I know that when individuals register with

Google for an account, Google asks subscribers to provide certain personal identifying

information.  Such information can include the subscriber's full name, physical address,

telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers,

means and source of payment (including any credit or bank account number).  In my training and

experience, such information may constitute evidence of the crimes under investigation because

the information can be used to identify the account's user or users.  Based on my training and my

experience, I know that even if subscribers insert false information to conceal their identity, this

information often provide clues to their identity, location, or illicit activities.

20.     Based on my training and experience, I also know that Google typically retains

and can provide certain transactional information about the creation and use of each account on

its system. This information can include the date on which the account was created, the length of

service, records of login (i.e., session) times and durations, the types of service utilized, the

status of the account (including whether the account is inactive or closed), the methods used to

connect to the account (such as logging into the account via the provider's website), and other

log files that reflect usage of the account.  In addition, Google often has records of the Internet

Protocol address ("IP address") used to register the account and the IP addresses associated with

particular logins to the account.  Because every device that connects to the Internet must use an

IP address, IP address information can help to identify which computers or other devices were

used to access the account.

21.     Google assigns an "anonymized" number, known as the Device ID or Obfuscated

ID, to a device, and the location data associated with a Device ID is never deleted. These data are available to law enforcement through the issuance of a probable cause search warrant. To obtain this information, Google requires a timeframe and general location, established either through a latitudinal/longitudinal point with a given radius or a polygon-shaped area with the latitude and longitude for each point of the polygon.

## BURGLARY OF FFL RTD MANUFACTURING

22.     On April 3, 2022, at approximately 4:52 AM, Goffstown NH Police Department received a call from Emilio Risoni, an employee of Bellemore Property Services located at 18 Lamy Drive in Goffstown, NH, of a suspected burglary in progress.

23.     Goffstown, NH Police immediately responded to the area and noted that the rear door of RTD Manufacturing had been forcibly opened and burglarized. "RTD Mfg" is a Federal Firearms Licensee with FFL No. 6-02-011-07-5D-01938.

24.     On April 3, 2022, at approximately 4:44 AM, a male suspect wearing a zippered long-sleeve hooded jacket (which may be made of a semi-transparent material with contrasting-colored zippers including a vertical zippered pocket on the left chest), pants, sneakers, a balaclava, and glasses (or sunglasses), used a large crowbar to gain access to the rear door of RTD Manufacturing located at 18 Lamy Drive, unit #5, in Goffstown, NH. The suspect moved through the manufacturing section of the business and went into the retail firearms sales portion of the business where the suspect proceeded to steal twenty-one firearms, including a machinegun and a silencer (both of which are also governed by the National Firearms Act). The suspect then left the FFL via the rear door. The suspect then returned and re-entered RTD Manufacturing via the rear entrance empty-handed, retrieved the large crowbar, and stole at least one additional firearm accessory. The suspect then left RTD Manufacturing again via the rear

door tripping and falling once on his way out of the manufacturing area of the FFL. This was

verified by review of the RTD Manufacturing security camera video which had cameras located

inside and outside the business.

    25.    The owner of RTD Manufacturing, Anthony Hook, provided the following list of

twenty-one stolen firearms:

| | MANUFACTURER | MODEL | CALIBER | TYPE | SERIAL NUMBER |
|---|---|---|---|---|---|
| 1 | FMK FIREARMS | AR-1 EXTREME | MULTI | RECEIVER/FRAME | FMK53050 |
| 2 | GLOCK GMBH | 19GEN5 | 9mm | PISTOL | BUPZ494 |
| 3 | GLOCK GMBH | 20GEN4 | 10mm | PISTOL | BVXW268 |
| 4 | GLOCK GMBH | 34GEN3 | 9mm | PISTOL | BUZL697 |
| 5 | GLOCK GMBH | 43X | 9mm | PISTOL | BUVK581 |
| 6 | GLOCK GMBH | 43X | 9mm | PISTOL | BVWR282 |
| 7 | GLOCK GMBH | 45 | 9mm | PISTOL | BUVL439 |
| 8 | GLOCK GMBH | 45 | 9mm | PISTOL | BUWS847 |
| 9 | GLOCK INC. | 34GEN 5 | 9mm | PISTOL | BTFF841 |
| 10 | GLOCK INC. | 42 | 380 | PISTOL | AFRW021 |
| 11 | GLOCK INC. | 21GEN4 | 45 | PISTOL | AGFC680 |
| 12 | HS PRODUKT | XD9 SUB COMPACT | 9mm | PISTOL | BA205959 |
| 13 | MOSSBERG | MC2SC | 9mm | PISTOL | 007679MA |
| 14 | SMITH & WESSON | M&P 9 | 9mm | PISTOL | HSF6657 |
| 15 | SMITH & WESSON | M&P 9 | 9mm | PISTOL | HUR4121 |
| 16 | RTD MFG | RT-15 | MULTI | RECEIVER/FRAME | RTM-00192 |
| 17 | CHARTER ARMS | PIT BULL | 9mm | REVOLVER | 21F11120 |
| 18 | CHARTER ARMS | UNDERCOVER LITE | 38 | REVOLVER | 21L13952 |
| 19 | TAURUS ARMS | 856 | 38 | REVOLVER | ACM604974 |
| 20 | RTD MFG | RT-15 | 5.56 | RIFLE | RTM-00136 |
| 21 | SILENCERCO LLC | OCTANE | 45 | SILENCER | OCT4515748 |

    26.    Further review of the RTD Manufacturing security cameras video showed that the

suspect was seen on the exterior video in both the front and rear of the store prior to the burglary

for approximately three to four minutes with and without the long crowbar he used to forceable gain access to RTD Manufacturing. In addition, the suspect appears to be wearing a smart watch on his left wrist that also appears to be illuminated as if he has the flashlight function of the smart watch activated.  I also know that the face of a smart watch illuminates more visibly on an infrared capable camera such as those equipped at RTD Manufacturing.  In addition, the illuminated face of the smart watch can even be visible through some clothing on when viewed by infrared capable cameras.  Through my training and experience, I know that smart watches can function independently like a smartphone with its own cellular capability and/or a smart watch can function in conjunction with a smart phone via wireless or Bluetooth connections.

27.     I know, based on my training and experience, that the vast majority of people use mobile phones and carry them with them at all times. I believe it is highly likely that the suspect would have an additional wireless device(s) with them when committing the offenses discussed in this affidavit. I also believe that people who target gun stores would likely use cellular telephones to search for the locations of those stores and/or to get directions to them.

28.     At the time of the burglary, none of the employees/owners of RTD Manufacturing or their cell phones were present.

29.     A neighborhood canvass conducted on April 3, 2022, of some of the surrounding businesses determined that only the Bellemore Property Services adjacent to RTD Manufacturing had camera footage showing the suspect casing the location prior to the burglary and leaving the scene.

30.     Investigators spoke with Mr. Risoni, who had called the suspected burglary into Goffstown Police Department.  Mr. Risoni is an employee of Bellemore Property Services which is the business immediately next to RTD Manufacturing and that shares a common dividing wall

within the same multi-unit building.  Mr. Risoni advised investigators that he sometimes sleeps

at the location as he does not reside within easy commuting distance.  Mr. Risoni stated he was

sleeping at the Bellemore Property Services on the morning of the burglary and was just starting

to get up when he heard the noise from the burglary.  As previously stated, Mr. Risoni then

called the Goffstown, NH Police to report the suspected burglary in progress.

31.    The area around Lamy Drive is a small scale industrial park that is made up of

multiple buildings and structures.  Many of the building are subdivided into multiple spaces for

small businesses.  The area also includes a USPS sorting facility, a storage facility and a Zoo

Health Club (a 24 hour access gym).  Based upon conversations with Goffstown Police, the

victim(s), and owners/employees of area businesses there would be no persons working or

present at that time of day on a Sunday, with the exception of the Zoo Health Club members and

Mr. Risoni sleeping at the Bellemore Property Services.

32.    On April 5, 2022, investigators reviewed the security video for New Hampshire

Stamping Company located at 9 Lance Lane in Goffstown, NH.  It should be noted that the time

on the security video from New Hampshire Stamping Company is approximately one hour and

ten minutes behind the actual time.  Therefore, the times that I refer to hereafter will be the

approximate adjusted actual time.

33.    At approximately 4:48 AM on April 3, 2022, the suspect can be seen walking

West down the alley between 30 Lamy Drive and 9 Lance Lane and away from FFL RTD

Manufacturing.  The suspect is walking in the direction of the wooded area that separates the

industrial park from state route 114.  The suspect is holding the bag he placed the firearms into

over his right shoulder and then uses his left hand to operate a suspected smartphone.  The

suspect disappears out of view of the camera walking in the same direction.





34.     On April 5, 2022, investigators viewed video surveillance footage of the Market

Basket grocery store located at 539 Donald Street, Bedford, NH.  The security cameras, which

were accurate to within seconds of the correct time, showed a vehicle pull into the view of the

camera in the parking lot at approximately 4:49 AM.  The vehicle entered the parking lot of the store, turned around, and left the parking lot.  The vehicle was seen on camera for approximately thirty seconds until it left the camera view heading towards the exit.  Due to the distance and image quality, investigators cannot determine the make, model, or license plate of the vehicle. Investigators noted that it appeared to be a light colored, medium to small SUV or sedan.

35.    It is possible that the burglary suspect had a co-conspirator that drove a vehicle that dropped off and picked up the suspect before and after the burglary from in a location near the FFL.  If that was the case, the co-conspirator/driver would have to wait for the suspect to complete the burglary and intended to pick the suspect up at a location in the same vicinity as where the suspect was dropped off.

36.    The timing of the light colored medium to small SUV/sedan arrival and departure from the Market Basket at approximately 4:49 AM in conjunction with the surveillance video of the suspect leaving the scene of the burglary and accessing his phone at approximately 4:48 AM it is possible that the driver of the white colored medium to small SUV/sedan is a co-conspirator and had received a call from the suspect advising that the suspect was ready to be picked up and thus why the vehicle did not stay or linger in the parking lot of Market Basket.

**TECHNICAL INFORMATION**

37.    On April 6, 2022, I identified the following for Target Location #1, being 18 Lamy Drive, unit #5 in the town of Goffstown, NH.  The polygon was chosen to include the majority of the industrial park area where RTD Manufacturing is located and to minimize the residential area included in the polygon. Target Location #1 is the geographical area identified as a polygon defined by the following latitude/longitude coordinates and connected by straight lines:



**Point 1:** 42.995119, -71.521574

**Point 2:** 42.996884, -71.521477

**Point 3:** 42.997450, -71.525785

**Point 4:** 42.995169, -71.526032

The Google geofence information for Target Location #1 is being requested during the following

time period in which investigators believe the suspect committed the burglary at the FFL, on

April 3, 2022, at approximately 4:44 AM EST.

38. On April 6, 2022, I identified the following for Target Location #2, being 539

Donald Street in the town of Bedford, NH. The polygon was chosen to include the area

of Market Basket, state Route 114, and the section of Donald Street that leads to the

entrance/exit of the Market Basket parking lot. Target Location #2 is the geographical area

identified as a polygon defined by the following latitude/longitude coordinates and connected

by straight lines:



**Point 1:** 42.971202, -71.506201

**Point 2:** 42.968743, -71.505590

**Point 3:** 42.968494, -71.508991

**Point 4:** 42.971796, -71.512805

The Google geofence information for Target Location #2 is being requested during the following time period in which investigators believe the suspect committed the burglary at the FFL, on April 3, 2022, at approximately 4:44 AM EST.

39. The proposed warrant sets forth a multi-step process whereby the government will obtain the information described above.  Specifically, as described in Attachment B.I:

   a. Using Location History data, Google will identify those devices that it calculated were or could have been (based on the associated margin of error for the estimated latitude/longitude point) within the Target Locations described in Attachment A during the time period described in Attachment A.  For each device, Google will provide a anonymized identifier, known as a Reverse Location Obfuscation Identifier ("RLOI"), that Google creates and assigns to device for purposes of responding to this search warrant; Google will also provide each device's location coordinates along with the associated timestamp(s), margin(s) of error for the coordinates (i.e,. "maps display radius"), and source(s) from which the location data was derived (e.g., GPS, wi-fi, bluetooth), if available.  Google will not, in this step, provide the Google account identifiers (e.g., example@gmail.com) associated with the devices or basic subscriber information for those accounts to the government.

   b. The government will identify to Google the devices appearing on the list produced in step 1 for which it seeks the Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

c. Google will then disclose to the government the Google account identifier associated with the devices identified by the government, along with basic subscriber information for those accounts.

40. This process furthers efficiency and privacy by allowing for the possibility that the government, upon reviewing contextual information for all devices identified by Google, may be able to determine that one or more devices associated with a Google account (and the associated basic subscriber information) are likely to be of heightened evidentiary value and warrant further investigation before the records of other accounts in use in the area are disclosed to the government.

**CONCLUSION**

41. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c).

42. I further request that the Court direct Google to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.  Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

/s/ John Forte
John Forte
Special Agent, ATF

The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: ___Apr 8, 2022___
Time: ___1:07 PM, Apr 8, 2022___

Hon. Andrea K. Johnstone
United States Magistrate Judge

## <u>ATTACHMENT A</u>

### Property To Be Searched

This warrant is directed to Google LLC and applies to:

(1) Location History data, sourced from information including GPS data and information about visible wi-fi points and Bluetooth beacons transmitted from devices to Google, reflecting devices that Google calculated were or could have been (as indicated by margin of error, *i.e.,* "maps display radius") located within the geographical region bounded by the latitudinal and longitudinal coordinates, dates, and times below ("Initial Search Parameters"); and

(2) identifying information for Google Accounts associated with the responsive Location History data.

### <u>Initial Search Parameters</u>

<u>Search Parameter 1</u> – 18 Lamy Drive, unit #5, Goffstown, NH 03045

- Date: April 3, 2022

- Time Periods (including time zone):
  o 4:35 AM EST through 5:05 AM EST

- Target Location:  Geographical area identified as:



A polygon defined by the following latitude/longitude coordinates connected by straight lines:

Point 1: 42.998918, -71.525112

Point 2: 42.994979, -71.525756

Point 3: 42.994948, -71.520188

Point 4: 42.998502, -71.519383

## ATTACHMENT B

### Particular Items to Be Seized

**I.    Information to be disclosed by Google**

The information described in Attachment A, via the following process:

1.    Google shall query location history data based on the Initial Search Parameters specified in Attachment A.  For each location point recorded within the Initial Search Parameters, and for each location point recorded outside the Initial Search Parameters where the margin of error (*i.e.*, "maps display radius") would permit the device to be located within the Initial Search Parameters, Google shall produce to the government information specifying the corresponding unique device ID, timestamp, location coordinates, display radius, and data source, if available (the "Device List").

2.    The government shall review the Device List and identify to Google the devices about which it seeks to obtain Google account identifier and basic subscriber information.  The government may, at its discretion, identify a subset of the devices.

3.    Google shall disclose to the government identifying information, as defined in 18 U.S.C. § 2703(c)(2), for the Google Accounts associated with each device ID appearing on the Device List about which the government inquires.

## II.        Information to Be Seized

All information described above in Section I that constitutes evidence of violations of Title 18, United States Code, United States Code, Section 922(u), theft of a firearm(s) from a Federal firearms licensee.

## III.       Use of Consistent Cipher

It is requested that in the case of multiple requested search parameters (locations) that Google Inc. apply the same cipher to each search parameter (location) to allow for a more educated comparison to ensure the proper analysis can be completed when the data from multiple locations is provided.